2011 UT App 330

**CoBON ENERGY, LLC, et al.,**
**Plaintiffs and Appellees,**

v.

**AGTC, INC., Alpine Coal Co., Inc., et al., Defendants and Appellants.**

No. 20100236–CA.

Court of Appeals of Utah.

Sept. 29, 2011.

E. Scott Savage, Stephen R. Waldron, and Kyle C. Thompson, Salt Lake City, for Appellants.

Evan A. Schmutz and William Kelly Nash, Provo, and Anthony W. Schofield and Peter C. Schofield, Orem, for Appellees.

Before Judges ORME, THORNE, and VOROS.

## OPINION

VOROS, Judge:

¶ 1 This appeal asks whether, by releasing its claims against Robena LLC in consideration for payment of $60,000 in unpaid consulting fees, Appellants Alpine Coal Co., Inc. and AGTC, Inc. (collectively, Alpine) also released a claimed $22 million in unaccrued claims against CoBon Energy, LLC (CoBon), Robena LLC's general partner and .01% owner. We hold that Alpine did not and, therefore, reverse.

## BACKGROUND

¶ 2 The Crude Oil Windfall Profit Tax of 1980, *see* 26 U.S.C. § 29 (1988) (current version at 26 U.S.C. § 45K (2006)), enacted a tax credit for producers of qualifying alternative energy sources (the Section 29 program). *See id.* One such alternative energy source was synthetic fuel from coal (synfuel). CoBon had acquired the right to use technology needed for converting coal to synfuel; Alpine was knowledgeable in the coal industry and had experience developing and marketing coal products. In December 1996, Alpine and CoBon entered into a consulting agreement (the 1996 Consulting Agreement) for the purpose of developing facilities for the production and sale of synfuel, thus generating significant tax credits under the Section 29 program.

¶ 3 Pursuant to the 1996 Consulting Agreement, Alpine agreed to provide consulting services and project development assistance. In exchange, CoBon agreed to pay Alpine 30% of the proceeds received from tax credits generated by the facilities. The facilities had to be completely developed by July 1, 1998, to qualify for the tax credit. Any facility developed before that date could generate tax credits until the end of 2007, at which time the Section 29 program expired.

¶ 4 The parties worked on nine separate projects for the development of synfuel facilities. Three of those projects resulted in the timely development of six synfuel facilities. These generated over $66 million for CoBon under the Section 29 program. About $5 million of those proceeds were generated by the Robena facility. The Robena facility was managed by Robena LLC, which originally was wholly owned by CoBon.

¶ 5 On March 27, 1998, Alpine, doing business as Viron Energy (Viron), sent CoBon a letter offering to identify, evaluate, and obtain raw materials for the operation of the Robena facility in exchange for a monthly fee. CoBon responded that Alpine was already required to provide this service under the 1996 Consulting Agreement. CoBon also expressed confusion over who Viron was, indicating that the March 27 letter was the first CoBon had heard of Viron.

¶ 6 After further negotiation, on May 8, 1998, CoBon sent Alpine a letter of understanding (the 5/8/98 LOU) agreeing to pay Viron $15,000 per month for identifying, evaluating, and obtaining suitable raw materials for the Robena project. However, in the 5/8/98 LOU CoBon reserved the right to offset payments made to Viron against its obligations to Alpine under the 1996 Consulting Agreement. On May 18, 1998, CoBon sent Alpine a second letter of understanding (the 5/18/98 LOU) stating that Robena "will hereafter enter into a consulting agreement for Viron's reasonable and necessary assistance and consultation in identifying, evaluating, and obtaining raw material resources suitable for the [Robena] project." Like the 5/8/98 LOU, this letter contained a reservation of rights. Representatives of both CoBon and Alpine signed this letter.

¶ 7 The following month, CoBon sold Robena LLC to an entity owned 99.99% by Providian Services LLC (Providian) and .01% by CoBon. CoBon retained its position as general partner and manager. On July 1, 1998, Robena LLC, then under control of Providian, sent Viron a letter, stating that "Robena hereby retains Viron's reasonable and necessary assistance and consultation in identifying, evaluating, and obtaining raw material resources suitable for the [Robena] Project," in exchange for a $15,000 monthly fee to Viron (the 1998 Retainer Agreement). The 1998 Retainer Agreement superseded the 5/18/98 LOU according to CoBon's President, who signed both. It also contained a reservation of rights.

¶ 8 Viron performed services pursuant to the 1998 Retainer Agreement and was paid for those services through April 1, 1999. After that date, Robena LLC stopped paying Viron. Two months later, Providian replaced CoBon with Palmer Management Corporation as the general manager of Robena LLC; CoBon remained a general partner. Viron continued to perform services under the 1998 Retainer Agreement through August 1999. On September 1, 1999, owed $60,000 in back payments for four months of services, Viron stopped work.

¶ 9 Viron sued Robena LLC in the Commonwealth of Pennsylvania for breach of contract, seeking damages of $60,000 in back payments (the Pennsylvania Action). Viron's complaint was signed and verified by Mark J. Rodak, an engineer and Viron's president.[1] The complaint relied on the 5/8/98 LOU with CoBon as the basis for the breach of contract claim and attached a copy. Robena LLC sought dismissal, noting that Viron had attached a letter of understanding with CoBon, not Robena LLC, and alleged that Viron had thus failed to establish a contract between Viron and Robena LLC.

¶ 10 Robena LLC and Viron settled in June 2000. Robena LLC paid Viron the $60,000 Viron sued for, and Viron signed the release that is the subject of this appeal (the Release). The Release released all "Released Parties" from "any and all claims ... and causes of action which relate to or arise out of any consulting services which have been performed by Viron regarding the Robena Synthetic Fuel Plant including, without limitation, claims asserted in, or that

---

1. Rodak is apparently not an attorney. Whatever the rule in Pennsylvania, "[i]t has long been the law of this jurisdiction that a corporate litigant must be represented in court by a licensed attorney." *Tracy–Burke Assocs. v. Department of Emp't Sec.,* 699 P.2d 687, 688 (Utah 1985) (per curiam).

could have been asserted in, the [Pennsylvania] Action."

¶ 11 The settlement of Viron's suit against Robena LLC had no apparent effect on CoBon's payments to Alpine under the 1996 Consulting Agreement. CoBon made payments to Alpine both before and after execution of the Release. In May 2000, before the execution of the Release, CoBon paid Alpine $10,000 based on anticipated distributions under the Section 29 program. In November and December 2001, after the execution of the Release, CoBon paid Alpine $408,000 in consulting fees under the 1996 Consulting Agreement based on tax credits received.

¶ 12 In the fall of 2002, Alpine demanded payment of additional distributable proceeds under the 1996 Consulting Agreement; CoBon responded by filing suit in Utah. CoBon sought a declaration that the 1996 Consulting Agreement had been rendered unenforceable by "tax laws and other circumstances," and that therefore Alpine was not entitled to further payments. Alpine counterclaimed for payments due—approximately $22 million by Alpine's tally—under the 1996 Consulting Agreement. The parties settled that dispute, agreeing to dismiss the claims and start anew.

¶ 13 In October 2006, CoBon again filed suit in Utah against Alpine seeking declaratory relief. However, CoBon abandoned its claim based on a change in tax law and instead alleged breach of contract for Alpine's refusal to perform services under the 1996 Consulting Agreement. Alpine counterclaimed for payments due and future distributions under the 1996 Consulting Agreement and for a declaration that the 1996 Consulting Agreement was enforceable. CoBon answered the counterclaims but did not identify the Release as an affirmative defense.

¶ 14 In 2008, CoBon filed a motion for summary judgment, asserting for the first time that the language of the Release executed in June 2000 between Viron and Robena LLC released CoBon from all claims by Alpine under the 1996 Consulting Agreement. The trial court granted CoBon's motion for partial summary judgment, ruling that the Release embraced Alpine's claims against CoBon. The trial court relied largely on three factors: in executing the 1998 Retainer Agreement on behalf of Robena LLC, CoBon had reserved its right to assert that Alpine was obligated to perform the duties Robena LLC was contracting with Viron to perform; in suing on the 1998 Retainer Agreement, Viron had attached the 5/8/98 LOU, which CoBon had signed, to its complaint; and the Release identified CoBon as a "Released Party." This court granted permission for Alpine to appeal the trial court's interlocutory order. *See* Utah R.App. P. 5(a).

## ISSUE AND STANDARD OF REVIEW

■ ¶ 15 Alpine contends that the trial court erred by construing the Release to bar Alpine's claims against CoBon under the 1996 Consulting Agreement and granting partial summary judgment on that ground. We "review[ ] a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness and view[ ] the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Bingham v. Roosevelt City Corp.*, 2010 UT 37, ¶ 10, 235 P.3d 730.

## ANALYSIS

¶ 16 Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). The parties agree that, pursuant to the terms of the Release, this case is governed by Pennsylvania law.

■ ¶ 17 "The courts of Pennsylvania have traditionally determined the effect of a release using the ordinary meaning of its language and interpreted the release as covering only such matters as can fairly be said to have been within the contemplation of the parties when the release was given." *Vaughn v. Didizian*, 436 Pa.Super. 436, 648 A.2d 38, 40 (1994) (emphasis, citation, and internal quotation marks omitted). The first step in construing a release under Pennsylvania law is "examining the ordinary meaning of its language." *See id.* "[I]t is crucial that a court interpret a release so as to discharge only those rights intended to be

relinquished." *Id.* "The court will adopt an interpretation that is most reasonable and probable bearing in mind the objects which the parties intended to accomplish through the agreement." *Harrity v. Medical Coll. of Pa. Hosp.,* 439 Pa.Super. 10, 653 A.2d 5, 10 (1994) (citation and internal quotation marks omitted). The second step is to construe the language of the release "in light of the conditions and circumstances surrounding its execution." *See Vaughn,* 648 A.2d at 40.

¶ 18 We thus begin with the language of the Release. The parties to the Release are Robena LLC and Viron. Viron was a dba used by Alpine specifically for purposes of the 1998 Retainer Agreement. The recitals state that the parties "desire to settle the claims, counterclaims and disputes between and among them," that is, the disputes between Viron and Robena LLC. This recital implies that broader claims between Alpine and CoBon were not within the contemplation of the parties.

¶ 19 The Release identifies both released parties and released claims. The passage identifying the released parties casts a wide net, naming fifteen people and entities—including CoBon—and twice employing the phrase "past, present or future":

> For purposes of this agreement, the term "Released Parties" shall mean the Parties and ... each of the named corporations and/or business entities and each of the named entit[ies'] subsidiaries, *past, present or future* parent or affiliated companies and/or entities, and each of their respective *past, present or future* predecessors, successors, departments, divisions, shareholders, partners, underwriters, insurers, directors, attorneys, officers, reinsurers, servants, employees, agents, managers, members and assigns including, without limitation, Providian Services LLC, Robena LP, Palmer Management Corporation, Palmer Capital Corporation, Coalco Corporation, Cobon Synfuel # 2, LLC, Cobon Energy, LLC, Steven R. Nash, Robert Nash, Donald Dargie, Gordon L. Deane, AGTC, Inc., Alpine Coal Co., Inc., Mark Rodak and Richard Visovsky.

(Emphases added.) The following sentence further expands the category of released parties, adding "their respective heirs, administrators, executors, agents and assigns." By comparison, the portion of the Release identifying the released claims is more limited, referring to

> any and all claims, counterclaims, debts, actions, judgments, and causes of action which relate to or arise out of any consulting services which have been performed by Viron regarding the Robena Synthetic Fuel Plant ... including, without limitation, claims asserted in, or that could have been asserted in, the [Pennsylvania] Action.

Four aspects of this description of the released claims are relevant to our attempt to identify what claims or potential claims were within the contemplation of the parties.

¶ 20 First, the Release refers to claims "which relate to or arise out of any consulting services which have been performed by *Viron.*" (Emphasis added.) CoBon makes much of the fact—and Alpine does not dispute it—that Viron was merely a dba of Alpine. Nevertheless, Alpine used this dba only in connection with the 1998 Retainer Agreement; it referred to itself as "A & A" in correspondence relating to the 1996 Consulting Agreement. Thus, a reference to consulting services performed by Viron suggests that the passage refers to consulting services performed by Alpine in connection with the 1998 Retainer Agreement only.

¶ 21 Second, the Release refers to claims relating to Viron's consulting services "regarding the Robena [project]." CoBon contends this phrase "plainly *expands* the scope of the Release to encompass the broader relationship between CoBon and [Alpine]." Accordingly, CoBon reasons, Alpine's "release of all claims 'which relate to or arise out of any consulting services which have been performed by Viron regarding the [Robena Project]' includes any other projects thereunder, including the [other synfuel] projects." We do not agree that the language limiting the released claims to those relating to the Robena project expands the scope of the Release. On the contrary, "[t]his is extremely clear limiting language." *See Harrity,* 653 A.2d at 11.

■ ¶ 22 "When interpreting contract language, specific provisions ordinarily will be regarded as qualifying the meaning of broad general terms in relation to a particular subject." *Eighth North–Val, Inc. v. Parkinson Pension Trust,* 2001 PA Super. 101, 773 A.2d 1248, 1255. CoBon's reading would yield the opposite result. It would effectively excise the reference to Robena altogether and read the phrase ."consulting services ... performed by Viron regarding the Robena Synthetic Fuel Plant" as if it said simply "consulting services ... performed by Viron." If the words "regarding the Robena Synthetic Fuel Plant" are to have any meaning, they must be read to exclude claims arising from consulting services not related to the Robena Synthetic Fuel Plant.

¶ 23 Third, the sentence identifying the released claims includes "claims asserted in, or that could have been asserted in, the [Pennsylvania] Action." The action referred to is the Pennsylvania Action that Viron filed against Robena LLC. CoBon notes that the complaint filed in the Pennsylvania Action relied on the 5/8/98 LOU between Viron and CoBon, which was attached to the complaint. CoBon further notes that in the 5/8/98 LOU CoBon reserved the right to deduct fees paid by Robena LLC to Viron from fees owed by CoBon to Alpine under the 1996 Consulting Agreement. It thus follows, CoBon forcefully contends, that Alpine's right to receive payment under the 1996 Consulting Agreement was a claim "asserted in, or that could have been asserted in, the [Pennsylvania] Action."

¶ 24 This interpretation of the passage does not reflect its ordinary meaning. "In a contract case, a cause of action accrues when there is an existing right to sue forthwith on the breach of contract." *Leedom v. Spano,* 436 Pa.Super. 18, 647 A.2d 221, 226 (1994) (citation and internal quotation marks omitted). As CoBon acknowledges, Alpine's claims under the 1996 Consulting Agreement had not "accrued for purposes of suit" as of the date of the Release. Accordingly, they were not among those claims "that could have been asserted in[ ] the Civil Action." They are thus not encompassed within this provision of the Release.[2]

¶ 25 Finally, the sentence identifying the released claims is notable for what it does not say: it does not refer to the 1996 Consulting Agreement. This omission is odd if the parties contemplated that Alpine would relinquish its right to collect, under the 1996 Consulting Agreement, its share of the tax credits generated by all the synfuel plants, revenues that potentially dwarfed by several orders of magnitude the $60,000 at issue in the Pennsylvania Action. In addition, the Release contains no reference to future, unaccrued, or unknown claims. CoBon asserts that the text of the Release "plainly bars such claims regardless of when such claims have been or might be filed or might be said to accrue." CoBon further asserts that the Release, using what it calls "forward-looking" language, discharges "any claim (i.e., past, present *or* future)" relating to services performed.

2. CoBon also argues that, even if Alpine could not have sued for damages at the time of the Release's execution, it clearly had a basis to sue for declaratory relief under the Consulting Agreement as to whether the services Viron separately contracted with Robena LLC to provide were in fact encompassed by the Consulting Agreement. In other words, while Alpine's damage claim might not have accrued, its claim for a declaration had accrued. *See Stilp v. Commonwealth,* 910 A.2d 775, 781 (Pa.Commw.Ct.2006) ("In order to sustain an action under the Declaratory Judgments Act, a plaintiff must demonstrate an actual controversy indicating imminent and inevitable litigation, and a direct, substantial and present interest." (citation and internal quotation marks omitted)).

We agree with CoBon that, under Pennsylvania law, where the two types of actions are distinct,

"[c]ourts ... have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed," 42 Pa. Cons.Stat. Ann. § 7532 (2007), and that the two claims might have different accrual dates, *see Total Control, Inc. v. Danaher Corp.,* 359 F.Supp.2d 387, 391–94 (E.D.Pa.2005) (holding that a breach of contract action for periodic payments does not accrue when the plaintiff becomes aware of the defendant's differing interpretation of the contract). However, CoBon seems to be asking us to analyze the claims separately for purposes of accrual but jointly for purposes of release—that is, to conclude that the breach of contract claim was released because the declaratory judgment claim had accrued. CoBon cites no Pennsylvania law supporting this approach, and we decline to adopt it.

¶ 26 The Release does employ forward-looking language. But it does so only to describe released parties, twice referring to "past, present or future predecessors, successors," etc. The Release employs no forward-looking language to describe released claims. *Cf., e.g., Bickings v. Bethlehem Lukens Plate*, 82 F.Supp.2d 402, 406 (E.D.Pa.2000) (involving release referring to claims "of any kind . . . whether known or unknown, whether suspected or unsuspected, . . . that I ever had, now have or may have or claim to have in the future against [Lukens] for or by reason o[f] any cause, matter or event whatsoever, from the beginning of time to the date of this General Release Agreement" (alterations in original) (internal quotation marks omitted)); *Vaughn v. Didizian*, 436 Pa.Super. 436, 648 A.2d 38, 39 (1994) (involving release referring to claims "the undersigned now has or hereafter may have on account of or in any way growing out of personal injuries known or unknown to me/us at the present time . . . resulting or to result from an occurrence which happened on or about August 12, 1983" (omission in original) (internal quotation marks omitted)).

¶ 27 "The courts of Pennsylvania have traditionally determined the effect of a release using the ordinary meaning of its language and interpreted the release as covering only such matters as can fairly be said to have been within the contemplation of the parties when the release was given." *Vaughn*, 648 A.2d at 40 (citations, emphasis, and internal quotation marks omitted). Indeed, *Vaughn* refers to "the cardinal rule of construction requiring that releases be strictly construed so as to not bar the enforcement of claims not yet accrued at the date of execution." *Id.*

¶ 28 In *Vaughn*, the Pennsylvania Superior Court noted that it had "failed to uncover" any "authority in which a Pennsylvania court has held that a general release discharged claims that had not yet accrued at the date of the execution of the release." *Id.* at 41. CoBon has not brought any such cases to our attention, nor has our research uncovered any. Instead, we have found Pennsylvania cases that have adhered to the cardinal rule's mandate, even in the face of very broad, forward-looking language in releases that would, seemingly, cover unaccrued claims. *See id.* at 39–41 (refusing to construe a release to cover an unaccrued claim despite the release's language waiving "all claims . . . the [plaintiff] now has or hereafter may have"); *Cady v. Mitchell*, 208 Pa.Super. 16, 220 A.2d 373, 374–75 (1966) (refusing to construe a release to cover an unknown claim despite the release's language waiving "all unknown, unforseen, unanticipated and unsuspected injuries").

¶ 29 CoBon reads *Vaughn* as holding that, under Pennsylvania law, a release will be read to release claims that have not accrued so long as they are "within the contemplation of the parties," *Vaughn*, 648 A.2d at 40–41. We cannot square that reading of the Pennsylvania rule with *Aetna, Inc. v. Lexington Insurance Co.*, 76 Pa. D. & C.4th 19, 2005 WL 2840327 (2005). *Aetna* involved three insurance companies. *See id.* at 21. After having judgment entered against it on an insurance claim, Aetna filed an insurance coverage action against its re-insurer, Lexington. *See id.* Lexington was in turn re-insured by ARIC, an Aetna affiliate. *See id.* at 21–22. Aetna and Lexington settled their dispute for $4,455,000, to be paid in two equal payments by Lexington to Aetna. *See id.* at 22. In connection with this settlement, Lexington signed a release discharging "all claims . . . and causes of action whatsoever (including any purported claims for reinsurance or additional premium or payment of any type from Aetna Releasors, *including ARIC*)." *Id.* (emphasis added).

¶ 30 After Lexington made the first of the two settlement payments, a dispute arose as to whether Lexington had released its re-insurance claim against ARIC. *See id.* at 22. The Court of Common Pleas of Philadelphia County ruled that the Release did not operate to release ARIC from Lexington's re-insurance claim. *See id.* at 26. The court reasoned that Lexington's re-insurance claim against ARIC "would accrue only after a settlement payment was made," and the first settlement payment was not made until two days after the Release was signed. *Id.* at 26. Therefore, Lexington's claim against ARIC had not quite accrued as of the date of the

Release. Citing *Vaughn*, the court ruled that it thus "would not have been the intent of the parties to release ARIC in its capacity as the reinsurer on the 'at risk' policy." *Id.* But cf. *Transportation Ins. Co. v. Spring–Del Assoc.*, 159 F.Supp.2d 836, 840–43 (E.D.Pa.2001) (ruling that an indemnity claim was within the contemplation of the indemnitee that signed a general release after it had been served with summons in the underlying action, although its duty to indemnify had not technically accrued under Pennsylvania law, which holds that "a claim for indemnification does not fully accrue for all purposes until payment is made to the injured third party").

¶ 31 Here, when the Release was executed in June 2000, CoBon was not in breach of the 1996 Consulting Agreement. Therefore, the claims at issue here had not yet accrued. *See Leedom v. Spano*, 436 Pa.Super. 18, 647 A.2d 221, 226 (1994); *see also Packer Soc'y Hill Travel Agency, Inc. v. Presbyterian Univ. of Pa. Med. Ctr.*, 430 Pa.Super. 625, 635 A.2d 649, 652 (1993) ("[A]n action based on contract accrues at the time of breach."). If anything, CoBon had anticipatorily performed by advancing Alpine $10,000 of anticipated proceeds from the Section 29 program.

¶ 32 Nevertheless, CoBon contends that Alpine's as yet hypothetical claims were within the contemplation of the parties in June 2008. CoBon notes that the 1998 Retainer Agreement was born of a dispute. As explained above, CoBon believed that Alpine was obligated under the 1996 Consulting Agreement to perform the very services Viron performed under the 1998 Retainer Agreement and that it had therefore, in effect, been required to pay twice for the same consulting services. The 5/8/98 LOU from CoBon to Viron explains this position, and expressly reserves the right to offset payments made to Viron under the 1998 Retainer Agreement against payments due to Alpine under the 1996 Consulting Agreement when the latter became due. The 5/18/98 LOU reaffirmed this reservation of rights in less precise language. Thus, at the time of the Release, the parties had arguably contemplated that CoBon might deduct any payments made to Viron under the 1998 Retainer Agreement from future distributions to

Alpine under the 1996 Consulting Agreement.

¶ 33 We do not believe that this background establishes that the parties contemplated a release of unaccrued, future claims by Alpine against CoBon. What the parties contemplated, according to the documents, was not a claim at all, but merely a right to make deductions from future payments should they become due. If anything, the assertion of this right to deduct assumed that future payments would be made. And at this stage, Alpine had no reason to believe otherwise.

¶ 34 But most importantly, the language of the Release does not support the claim that Alpine contemplated the release of possible future or unaccrued claims under the 1996 Consulting Agreement. The question would be closer if the Release identified, for example, claims that Alpine "ever had, now has (or have), or which [it] hereafter can, shall or may have, for or by reason of any cause, matter or thing whatsoever, from the beginning of the world." *Transportation Ins. Co.*, 159 F.Supp.2d at 838. The question before us would then be whether Pennsylvania law requires us to *narrow* the scope of the literal language of the Release, which by its own terms encompasses claims not yet arisen or accrued. But the Release here contains no reference to claims that Alpine "hereafter ... may have," or any other words describing claims that might arise or accrue in the future. CoBon thus asks us to use Pennsylvania law to *expand* the scope of the Release beyond its literal language. Doing so would make *Vaughn*'s rule of strict construction a rule of liberal construction, contrary to clear Pennsylvania law.

¶ 35 In sum, the ordinary meaning of the Release is that the parties released each other and many other people and entities, including CoBon, from presently existing claims arising from services performed by Alpine, doing business as Viron, with respect to the Robena project, pursuant to the 1998 Retainer Agreement. But the second step in Pennsylvania's rule is to construe the language of the release "in light of the conditions and circumstances surrounding its execution." *Vaughn v. Didizian*, 436 Pa.Super.

436, 648 A.2d 38, 40 (1994). We have already briefly discussed the parties' conduct before signing the Release. Their conduct thereafter reinforces our reading of the language of the Release.

¶ 36 Nothing in the conduct of the parties indicates that a release of future claims against CoBon under the 1996 Consulting Agreement was within their contemplation at the date of the Release. To the contrary, CoBon's actions after execution of the Release are wholly consistent with a more restrictive reading of the Release. In late 2001, well after the Release was executed and after Alpine had completed performance, CoBon paid Alpine $408,000 in proceeds under the 1996 Consulting Agreement. Around this same time, CoBon provided Alpine with a summary of the distributable proceeds under the 1996 Consulting Agreement. Similarly, in November 2002, when seeking declaratory relief that the 1996 Consulting Agreement was unenforceable, CoBon cited a change in the tax law as justification; it did not mention the Release. Even as late as October 2006, when Alpine filed a counterclaim to CoBon's suit, CoBon's answer did not mention the Release. *See* Utah R. Civ. P. 8(c) ("In pleading to a preceding pleading, a party shall set forth affirmatively ... [the defense of] release, ... and any other matter constituting an avoidance or affirmative defense."); *id.* R. 12(h) ("A party waives all defenses and objections not presented either by motion or by answer or reply....").

¶ 37 When examining the surrounding circumstances, Pennsylvania courts have also looked at the consideration given for a release. *See Harrity v. Medical Coll. of Pa. Hosp.,* 439 Pa.Super. 10, 653 A.2d 5, 11 (1994) (construing a release as limited to Claridge Hotel in part because "[t]he release is for a nominal amount, commensurate with the limited liability of Claridge Hotel"); *Cady v. Mitchell,* 208 Pa.Super. 16, 220 A.2d 373, 374 (1966) ("[W]ords used in a release ought never to be extended beyond the consideration." (citing *Cockcroft v. Metropolitan Life Ins. Co.,* 125 Pa.Super. 293, 189 A. 687 (1937))). Here, Alpine was anticipating a 30% share of significant Section 29 proceeds

under the 1996 Consulting Agreement. In 1998 the parties did not know how much, if any, revenue the synfuel plants would generate. By all accounts, however, the scope of the undertaking was consequential; it involved three projects and six synfuel facilities, was to last for nearly a decade, and was intended to generate, in CoBon's words, "substantial revenue" in royalty fees. Sixty-six million dollars was eventually generated; by Alpine's estimate, it is entitled to $22 million. Yet, Alpine, doing business as Viron, settled for only $60,000, the very amount it was owed by Robena LLC under the 1998 Retainer Agreement.[3] This amount does not appear to be commensurate with the value of the claims that CoBon contends were released.

¶ 38 In sum, we do not agree that by executing a Release in settlement of a $60,000 dispute with Robena LLC, Alpine also released potentially tens of millions of dollars in claims Alpine later accrued under the 1996 Consulting Agreement against CoBon, Robena's .01% owner. Our conclusion is based principally on the language of the Release. In describing the released claims, the Release speaks of existing claims involving the Robena facility only and does not mention the 1996 Consulting Agreement. Nor does it contain any language purporting to release future claims or claims not yet accrued. Under Pennsylvania law, we would have to strictly construe any such broad, prospective language to ensure that the scope of the Release did not exceed the parties' intent. We find no warrant in Pennsylvania law for expanding the scope of the literal language of a release to embrace claims outside its ordinary meaning. An interpretation limiting the scope of the Release to claims between Viron and Robena LLC that had arisen from the 1998 Retainer Agreement "is most reasonable and probable bearing in mind the objects which the parties intended to accomplish through the agreement." *Harrity,* 653 A.2d at 10 (citation and internal quotation marks omitted).

¶ 39 This reading of the Release is also entirely consistent with the parties' conduct. Although CoBon now claims that the June

---

**3.** As .01% owner of Robena LLC, CoBon was    theoretically responsible for $6.00.

2000 Release extinguished its obligations to make payments under the 1996 Consulting Agreement, CoBon paid Alpine $408,000 in Section 29 proceeds well after Alpine signed the Release. Additionally, in answering Alpine's counterclaims seeking amounts due under the 1996 Consulting Agreement, CoBon pleaded various defenses in its responsive pleadings, but it did not plead the Release. Nothing in CoBon's post-Release conduct contradicts our restrictive reading of the Release.

## CONCLUSION

¶ 40 We conclude that the ordinary language of the Release and the undisputed circumstances surrounding its execution establish as a matter of law that the Release, which settled the dispute under the 1998 Retainer Agreement, did not extinguish Alpine's claims against CoBon under the 1996 Consulting Agreement.

¶ 41 Accordingly, we reverse the grant of partial summary judgment and remand for further proceedings.

¶ 42 WE CONCUR: GREGORY K. ORME, and WILLIAM A. THORNE JR., Judges.