2026 UT App 23

## THE UTAH COURT OF APPEALS

J-M MANUFACTURING COMPANY, INC.,
Appellant and Cross-appellee,
*v.*
PWE (MULTI) QRS 14-85, INC.,
Appellee and Cross-appellant.

Amended Opinion[*]
No. 20230908-CA
Filed Februar 12, 2026

Third District Court, Salt Lake Department
The Honorable Robert P. Faust
No. 210903495

Bryon J. Benevento and Adam C. Buck,
Attorneys for Appellant and Cross-appellee

Julianne P. Blanch and John L. Cooper,
Attorneys for Appellee and Cross-appellant

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JOHN D. LUTHY concurred.

TENNEY, Judge:

¶1      J-M Manufacturing Company, Inc. (JM), a tenant, exercised its option to purchase several properties that it had been leasing from PWE (Multi) QRS 14-85, Inc. (PWE), the landlord. When the parties could not agree on a purchase price, they brought the issue

---

[*] This amended opinion replaces the original opinion that was issued on December 11, 2025. In response to a rehearing petition filed by J-M Manufacturing Company, Inc., we have made changes to paragraph 25. In response to a rehearing petition filed by PWE (Multi) QRS 14-85, Inc., we have moved and then made changes to footnote 3. The rest of the opinion remains unchanged.

to the district court. As the case unfolded, the parties also litigated the question of whether JM had ongoing rent obligations up through the time that the purchase was completed. The district court ultimately granted summary judgment in favor of PWE on both the purchase price and the ongoing rent issue, and it also awarded PWE its attorney fees.

¶2     JM now appeals, challenging the district court's rulings on unpaid rent and attorney fees. For the reasons set forth below, we first agree with the district court that PWE was entitled to ongoing rent, although not for the full period awarded by the district court. We accordingly remand for a limited revision of the judgment. We next conclude that the lease was ambiguous as to whether PWE was entitled to attorney fees (and, if so, under what provision), so we reverse the district court's grant of summary judgment on that issue and remand for further proceedings.

BACKGROUND[1]

¶3     In February 2002, PWE and JM signed a lease agreement (the Lease) as landlord and tenant, respectively, for four properties in Utah, California, Oregon, and Washington (the Properties). The parties agreed to a 20-year term of the Lease.

¶4     The Lease gave JM an "Option to Purchase" (the Purchase Option) that allowed JM to buy the Properties from PWE for a "Purchase Price" outlined by the Lease. The Lease contained a

---

1. "When reviewing a decision to grant summary judgment, we must review the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, and we recite the facts accordingly." *E & H Land, Ltd. v. Farmington City*, 2014 UT App 237, n.1, 336 P.3d 1077 (quotation simplified).

provision under which the Purchase Price would be determined by the "Fair Market Value." Paragraph 2 of the Lease provided,

> "Fair Market Value" . . . shall mean the higher of (a) the fair market value of the [Properties] or any Related Premises, as the case may be, as of the Relevant Date as if unaffected and unencumbered by this Lease or (b) the fair market value of the [Properties] or Related Premises, as the case may be, as of the Relevant Date as affected and encumbered by this Lease and assuming that the Term has been extended for all extension periods provided for herein.

¶5 Paragraph 29 of the Lease outlined the procedure that would be used to determine Fair Market Value if JM exercised its Purchase Option. First, the parties agreed to attempt to negotiate Fair Market Value themselves. Second, if they were unable to reach an agreement, each party was to select an appraiser, and the two appraisers would then "endeavor to agree upon Fair Market Value based on a written appraisal made by each of them." Third, if the appraisers were unable to agree upon Fair Market Value, those appraisers would "select a third appraiser to make the determination" based on the average of the third appraiser's Fair Market Value amount and the amount determined by the appraiser "nearest to that of the third appraiser."

¶6 On April 2, 2021, JM exercised the Purchase Option, and the parties soon attempted to agree upon Fair Market Value. When they were unable to reach an agreement, they each selected an appraiser. But the appraisers were also unable to reach an agreement as to Fair Market Value, in large part because the parties disagreed about whether "Additional Rent"—a term that was broadly defined in the Lease to include a variety of costs and expenses that JM would incur in the future—should be included in the assessment of Fair Market Value. PWE maintained that

Additional Rent should be included, while JM maintained that it should not.

¶7 In July 2021, JM filed a complaint against PWE, asking the district court for (1) declaratory judgment in its favor regarding the "meaning of the term Fair Market Value," and (2) an injunction to stop the appraisal process until the court made that determination. A month later, PWE filed an answer and a counterclaim against JM, wherein it asked the district court to enforce "the plain language of the Lease" and require "the parties to engage in the Appraisal Process as specifically set forth by the Lease." PWE also filed a motion for declaratory judgment, arguing that the Lease required Additional Rent "to be included in the appraised Fair Market Value of the Properties."

¶8 In December 2021, the district court denied PWE's motion, concluding that the Lease was ambiguous as to whether Additional Rent should be part of the assessment of Fair Market Value. That same month, JM also stopped paying the quarterly rent payments that it had previously been paying as a tenant under the Lease. A short time later, PWE instructed its appraiser to not include Additional Rent in her appraisal and to try to work with JM's appraiser to reach an agreement on Fair Market Value without that component. On May 5, 2022, the two appraisers reached an agreement that Fair Market Value for the Properties would be $42.5 million if unencumbered by the Lease, and $53.5 million if encumbered by the Lease. As noted, Paragraph 2 of the Lease stated that the higher of these two values would constitute the Purchase Price.

¶9 On May 20, 2022, PWE sent a letter to JM expressing its intention to close on JM's purchase of the Properties on June 3, 2022, for the Purchase Price of $53.5 million. But after receiving this letter, JM did not agree to close on that date as requested, instead contending that the $53.5 million amount was "artificial

and unsupportable," and further claiming that there were still ambiguities in the Lease that needed to be resolved.

¶10   In response to these developments, PWE amended its counterclaim, now adding two additional claims that are relevant to this appeal: first, it asked the court to order specific performance of the Lease, and it more specifically asked the court to order JM to complete the purchase of the Properties with the Purchase Price being $53.5 million; second, it asserted that JM should be held liable for breach of the Lease based on its failure to maintain the Properties as the process of completing the purchase unfolded. In May 2023, PWE filed two motions for summary judgment that, in parts relevant to this appeal, sought judgment as a matter of law on the issue of specific performance, and also sought damages based on JM's failure to continue paying rent after it exercised the Purchase Option and while litigation over the closing had proceeded.[2]

¶11   JM opposed PWE's motions for summary judgment. With respect to the specific performance claim, JM argued that because of alleged ambiguities in the Lease as to the assessment of Fair Market Value, specific performance was not warranted. With respect to the Ongoing Rent claim, JM argued that because it had exercised its Purchase Option, it was now a "buyer in possession" and therefore no longer had any obligation to pay rent, and it further argued that if the Fair Market Value purchase price was based on an assumption that the Properties were encumbered by the Lease, then awarding damages for Ongoing Rent would improperly give PWE a double recovery.

¶12   In August 2023, the district court held a hearing regarding PWE's motions for summary judgment. The next day, it issued a written ruling granting PWE's motions. With regard to specific

---

2. For simplicity, we'll refer to the second request as "the Ongoing Rent claim."

performance, the court concluded that the parties had properly engaged in the evaluation of Fair Market Value of the Properties under the terms set forth in the Lease, and it further concluded that the "determination of $53.5 million" was now "'binding and conclusive' on the parties." The court accordingly granted PWE's request for specific performance. With respect to the Ongoing Rent claim, the court concluded that "JM ha[d] not paid rent since December 2021," that PWE was "entitled [to] such amounts," and that awarding Ongoing Rent "would not result in a double recovery." The court thus ordered JM to "pay rent to the time period it has or will occupy the premises."

¶13    On September 13, 2023, the district court entered judgment against JM. With respect to the specific performance issue, the court ordered JM to pay PWE $53.5 million for the Properties "via a commercial real estate closing to occur within 60 days from the entry of [the] Judgment." The court also ordered JM to pay $3,836,507 in damages, which "represent[ed] the sum of unpaid rent in the amount of $3,287,618, late fees in the amount of $164,381, and default interest in the amount of $384,508, through August 25, 2023." On November 13, 2023, JM paid the purchase price of $53.5 million and closed on the sale of the Properties.

¶14    Before closing, PWE filed a motion requesting an award of attorney fees and costs in the amount of $549,439.64, consisting of $520,147.00 in attorney fees and $29,292.64 in costs. In doing so, it invoked Paragraph 7(a)(i)(F) of the Lease, which, under the heading of "Additional Rent," further defined that term to require JM to pay "the prosecution, defense, or settlement of any litigation involving or arising from any of the [Properties], this Lease, or the sale of the [Properties]" to PWE. JM opposed this motion, contending that this provision was not the applicable attorney fees provision in these circumstances. JM instead argued that any request for attorney fees should be governed by Paragraphs 20 and 23, which were entitled "Procedures Upon Purchase" and "Remedies and Damages Upon Default," and JM then contended

that neither of these provisions justified an award of fees "in the context of this case." The court later granted PWE's motion and awarded it $512,465.00 in attorney fees and $29,037.73 in costs.

ISSUES AND STANDARDS OF REVIEW

¶15    JM raises two issues on appeal. First, it argues that the district court erred in granting summary judgment on PWE's breach of Lease claim and then awarding Ongoing Rent damages as a result. "We review a district court's grant or denial of summary judgment, as well as the court's interpretation of contracts upon which the summary judgment was based, for correctness." *Bloom Master Inc. v. Bloom Master LLC*, 2019 UT App 63, ¶ 11, 442 P.3d 1178 (quotation simplified).

¶16    Second, JM argues that the court erred in granting PWE's motion for attorney fees, arguing that it was based on an erroneous interpretation of the Lease. The question of whether attorney fees are recoverable is a question of law that we review for correctness. *See Young H2ORE LLC v. J&M Transmission LLC*, 2024 UT App 10, ¶ 26, 543 P.3d 1264 (quotation simplified).

ANALYSIS

I. Ongoing Rent

¶17    JM first argues that the district court erred in granting summary judgment on PWE's claim that JM was obligated to continue paying rent after JM exercised its Purchase Option. For the reasons set forth below, we agree with the district court that JM was obligated to continue to pay rent during most of the period in question, although we conclude that JM was not required to pay rent for an initial 180-day period.

¶18  Paragraph 20 of the Lease was titled "Procedures Upon Purchase," and it set forth a series of provisions governing how JM's purchase of the Properties would proceed once it exercised its Purchase Option. Of note, Paragraph 20(c) stated that "[i]f the completion of [the] purchase [of the Properties] shall be delayed for more than one hundred eighty (180) days after (i) the Termination Date . . . or, (ii) the date scheduled for such purchase, . . . then . . . Rent shall *continue* to be due and payable until completion of such purchase." (Emphasis added.) In our view, the plain reading of this provision is that, once JM exercised its Purchase Option, its rent obligations would be suspended for 180 days, but if the parties did not then close on the transaction within that period, JM's rent obligations would then resume and would last until closing.

¶19  This is so in large part because of the combination of the 180-day period and the word "continue." If it were somehow the case that JM had ongoing obligations to pay rent all the way through closing, the 180-day term and the particular use of the word "continue" would make little sense. But if it were instead the case that JM had no rent obligations after the 180-day period, then this provision in general and the term "continue" in particular would be rendered effectively meaningless.

¶20  Our interpretation of this provision is consistent with what JM has referred to as the "buyer in possession" doctrine. As explained by our supreme court, this doctrine holds that "when a lessee exercises an option to purchase during the term of the lease, the lease and the relation of lessor and lessee is terminated. The relation of vendor and vendee is then created. All obligations under the lease are extinguished." *Park West Village, Inc. v. Avise*, 714 P.2d 1137, 1141 (Utah 1986); *see also Richard Barton Enters., Inc. v. Tsern*, 928 P.2d 368, 378 (Utah 1996) ("The general rule is that a lessee's exercise of an option to purchase terminates the lease and all *future* obligations under the lease." (emphasis in original)). One

leading treatise summarizes the general common law on this concept as follows:

> A tenant's obligations under a lease are terminated upon exercise of the option to purchase, and the rights of the parties are determined by the contract for sale and not the lease. Thus, if the lessee properly exercises an option to purchase in conformity with the conditions prescribed by the lessor, the lessor loses any rights that it may have had under the lease. Thus, the lessor cannot recover rent after the option to purchase is exercised, *absent an express provision* to that effect.

49 Am. Jur. 2d *Landlord and Tenant* § 322 (2025) (emphasis added, quotation otherwise simplified). At oral argument, JM conceded that while the buyer in possession doctrine sets forth a general rule, parties can contract around it, and we think that concession is well-taken.

¶21    Thus, as explained, (1) the suspension of JM's rent obligations during the initial 180-day period, and (2) the continuation of the rent obligation after that period, were both established by the express terms of Paragraph 20(c), and this interpretation of that paragraph is consistent with how the buyer in possession doctrine generally operates.

¶22    Given this, the next question is when the 180-day period began. As noted, Paragraph 20(c) provided two alternative starting dates.

¶23    The first date was the "Termination Date." Under the Lease, the term "Termination Date" was defined as being linked to a "Termination Notice," which was then linked to certain defined "Termination Events." Those Termination Events were then defined as including either "a Taking" of the properties—

with "Taking" being defined as a taking through condemnation or eminent domain—or instead an event in which a "substantial portion" of any of the properties was "totally damaged or destroyed by a Casualty." None of these events are alleged to have occurred in this case.

¶24 The second date was the "date scheduled for such purchase." In context, this was properly understood as a reference to Paragraph 38 of the Lease, which governed the process by which JM could exercise its Purchase Option. Under Paragraph 38(a), once JM exercised its Purchase Option, the parties were required to close on the purchase within 60 days of the date of the expiration of the original 20-year term unless the parties "mutually agree[d]" in a "written agreement" to extend the closing date. But as JM conceded at oral argument in this appeal, the parties never entered into a written agreement for a different closing date. As a result, the operative date here would have been 60 days after the expiration of the original 20-year term, which the parties agreed was February 28, 2022.

¶25 As a result, we conclude that under the plain language of the Lease, JM's rent obligations were suspended for 180 days beginning on April 29, 2022 (i.e., 60 days after February 28, 2022), that this 180-day suspension period thus ended on October 26, 2022, and that the Ongoing Rent obligations then "continued" until the purchase was completed, which occurred on November 13, 2023. Because it's undisputed that JM stopped paying rent in March 2022, the district court was correct to rule that JM had breached the lease by doing so—at least as it relates to the payments that were due after the 180-day period concluded.

¶26 JM pushes back on several fronts, but we find none of them persuasive.

¶27 First, JM places heavy reliance on the "buyer in possession" doctrine, but as we've explained, parties can contract

around that doctrine, and the parties did so here by agreeing to a provision under which JM's rent obligations would "continue" if closing did not occur within 180 days of a specified date. We therefore are not persuaded that this doctrine prevented PWE from recovering most of the Ongoing Rent it sought.

¶28    Second, JM argues that allowing PWE to recover unpaid rent would impermissibly give it a "double recovery." In Utah, the bar on double recovery exists as a branch of the election of remedies doctrine. *See Cohen Braffits Estates Dev., LLC v. Shae Fin. Group*, 2024 UT App 12, ¶ 38, 543 P.3d 1277, *cert. denied*, 550 P.3d 994 (Utah 2024). "In its most basic terms, the election of remedies doctrine prevents double redress for a single wrong." *Id.* (quotation simplified); *accord KTM Health Care Inc. v. SG Nursing Home LLC*, 2018 UT App 152, ¶ 64, 436 P.3d 151. In JM's view, awarding Ongoing Rent to PWE constituted a double recovery because that rent was already included in the assessment of Fair Market Value. We disagree.

¶29    Again, the double recovery doctrine is designed to prevent a party from recovering twice for the same wrong. But this is not what happened here. As explained, the Lease specifically stated that, if the parties did not complete the closing within 180 days of one of two specified events, JM's rent obligations would "continue" until the purchase was completed. This provision was separate from the other provisions in the Lease regarding the Purchase Price, and in context, it essentially operated as both an incentive provision and a contingency. It ensured that once JM chose to exercise its Purchase Option (a decision that would have then been binding on PWE), JM would do everything possible to pay PWE what PWE was now owed as the Purchase Price within the agreed-upon period so that PWE could have the benefit of those funds. By contrast, there would be no continuation of rent payments if the parties closed within the 180-day period. We therefore do not regard the unpaid rents at issue as a double

recovery, but instead as damages that were awardable under a separate provision of the Lease.

¶30    Third, JM argues that, even if PWE was entitled to Ongoing Rent for the interim period, PWE did not provide sufficient evidence to support its request for damages. We again disagree.

¶31    As discussed, the district court awarded damages based on the Ongoing Rent claim. But the rent that was owed was based on the plain terms of the Lease itself. The Lease had terms setting forth what constituted rent, how rent was to be calculated, and when rent was due. Thus, to calculate damages based on unpaid rent, the district court was not required to look beyond the language of the Lease itself. Rather than a factual inquiry, the question before the court was a legal one—what did the Lease say about when the additional rent was due and for how much? Because the Lease was fully before the court, we see no problem of proof.

¶32    Finally, as part of its argument that PWE did not provide sufficient proof of damages, JM argues that the court should have rejected PWE's request for summary judgment for Ongoing Rent because PWE didn't "separately state[]" the facts supporting that request in numbered paragraphs as required by rule 56 of the Utah Rules of Civil Procedure.

¶33    At the outset of its motion for summary judgment, however, PWE asserted that it was seeking damages in the amount of "$2,947,096.46 in unpaid rent to PWE, $147,354.82 in late fees, and $256,466.39 in interest at the Default Rate under the Lease through May 1, 2023." PWE then included a "Statement of Undisputed Material Facts" that set forth, in separately numbered paragraphs, the basis for its motion. Among those paragraphs were paragraphs specifically asserting that JM was obligated to pay rent under identified provisions from the Lease, that JM was obligated to pay rent until the parties closed on the purchase, and

that JM had not paid rent for certain identified months. This was enough to comply with PWE's obligations under the rule.

¶34    In short, we largely affirm the district court's conclusion that JM breached the Lease by not paying Ongoing Rent up through closing. But for the reasons set forth above, we also conclude that JM did not owe rent during the 180-day period described above. We accordingly remand the case to the district court for the limited purpose of adjusting the damages award to reflect the amount that is consistent with this opinion.[3]

---

3. In the original briefing, PWE filed a cross-appeal in which it asserted that, "[i]f this [c]ourt reverses the district court's decision to award PWE unpaid rent," this court should then conclude that PWE was entitled to interest on the Purchase Price at the "Default Rate" provided in the Lease. As indicated by the above framing, this cross-appeal was decidedly conditional, becoming operative only "if" PWE lost on the Unpaid Rent issue. The conditional nature of the cross-appeal was also evidenced by PWE's principal justification for it—namely, its assertion that "if" it was not entitled to Ongoing Rent, it was then entitled to interest on the Purchase Price to "compensate[]" it "for not receiving the use of the Purchase Price amount when it should have." Indeed, at oral argument, PWE expressly described this as an "alternative claim" that this court should "only to get to if it does a complete reversal of the trial court on the unpaid rent claim."

In our original opinion—the key portions of which are unchanged in this amended opinion—we largely affirmed the district court's conclusion that PWE was entitled to Ongoing Rent, but with the caveat that PWE was not entitled to such rent for the 180-day suspension period. In light of this, it was unclear to us whether PWE still intended to advance its conditional cross-appeal, so we included a footnote allowing PWE to file a rehearing petition requesting a ruling on that issue if it wished.

(continued…)

PWE has now taken us up on the offer and filed a rehearing petition. But in doing so, PWE broadened the scope of its argument. Rather than asserting that it should be awarded interest for any period in which it did not receive Ongoing Rent, PWE asked us to rule that it was entitled to interest "in lieu of" or "instead of unpaid rent damages." Though a touch unclear, PWE seems to now be asking us to rule that it was always entitled to something of a choice of damages, which in theory would always have been an operative argument even if it had prevailed on the Ongoing Rent issue. But because this is a new argument that was presented for the first time in a rehearing petition, this argument is not properly before us. *See State v. Goins*, 2017 UT 61, ¶ 54, 423 P.3d 1236. Moreover, it's also at odds with the conditional nature of PWE's original briefing and argument, wherein PWE pointedly asked for relief only if we ruled that it was not entitled to Ongoing Rent. For these reasons, we decline to address this aspect of PWE's rehearing petition.

This leaves the question of what to do with the 180-day suspension period. As discussed, PWE's cross-appeal is premised on its assertion that it should receive interest for periods in which it did not receive Ongoing Rent and in which it "should have" received the Purchase Price but did not. But we have concluded that, within the same Lease, PWE contractually agreed to a scheme under which it would not receive Ongoing Rent during a delineated 180-day suspension period. Whether it be in the original briefing or in the rehearing petition, PWE has not persuaded us that it was entitled to recover interest at the Default Rate during that suspension period. To the extent that PWE's cross-appeal implicates that period, we conclude that PWE has not carried its burden of persuasion, and we therefore reject this claim.

II. Attorney Fees

¶35    JM next argues that the district court erred in awarding PWE attorney fees. We agree that under the current circumstances of this case, the award was improper.

¶36    "In Utah, attorney fees are awarded only if authorized by statute or contract. If provided for by contract, attorney fees are awarded in accordance with the terms of the contract." *Capozzoli v. Madden*, 2024 UT App 176, ¶ 48, 561 P.3d 727 (quotation simplified). Although the Lease does not contain a stand-alone attorney fees provision, PWE based its request on the interplay between two provisions. First, under Paragraph 7(a)(i)—which was part of the same broad provision discussed above entitled "Additional Rent"—JM was obligated to pay "all costs and expenses" of PWE that were "incurred in connection or associated with . . . the prosecution, defense or settlement of any litigation involving or arising from any of the [Properties], this Lease, or the sale of the [Properties]." Second, in the definitions provision set forth in Paragraph 2, the term "Costs" was defined to include "attorney[] fees and expenses," as well as "court costs." In light of this language, we believe that PWE has put forward a reasonable assertion as to why it might be entitled to attorney fees in this case.[4]

---

4. It may seem odd to include attorney fees within a provision entitled "Additional Rent." But "'parties to a contract may define their terms as they please—a duck may be a goose,' 'up may be defined as down, right as left, day as night.'" *Cocks v. Swains Creek Pines Lot Owners Ass'n*, 2023 UT App 97, ¶ 56, 536 P.3d 130 (Tenney, J., concurring) (quoting *Penncro Assocs., Inc. v. Sprint Spectrum, LP*, 499 F.3d 1151, 1152, 1157 (10th Cir. 2007)). And we're aware of at least one other case that construed a contract that likewise included attorney fees within an "Additional Rent"

(continued…)

¶37 But even so, JM pushes back on PWE's reliance on Paragraph 7(a), and we see some potential merit to its contention as well.

¶38 When interpreting contracts, "we examine the entire contract and all of its parts in relation to each other and give a reasonable construction of the contract as a whole to determine the parties' intent." *Gillmor v. Macey*, 2005 UT App 351, ¶ 19, 121 P.3d 57 (quotation simplified). It is therefore "axiomatic that a contract should be interpreted so as to harmonize all of its provisions and all of its terms, which terms should be given effect if it is possible to do so." *Id.* (quotation simplified). Moreover, when Utah courts interpret contract language, "specific provisions ordinarily will be regarded as qualifying the meaning of broad general terms in relation to a particular subject." *CoBon Energy, LLC v. AGTC, Inc.*, 2011 UT App 330, ¶ 22, 264 P.3d 219 (quotation simplified). If there is a conflict between different provisions in a contract, "general terms and provisions are restricted by specific terms and provisions following them." *Smith v. Smith*, 2017 UT App 40, ¶ 16, 392 P.3d 985 (quotation simplified). Additionally, courts "attempt to give effect to each provision" and will "look for a reading that harmonizes the provisions and avoids rendering any provision meaningless." *UDAK Props. LLC v. Canyon Creek Com. Center LLC*, 2021 UT App 16, ¶ 18, 482 P.3d 841 (quotation simplified). "An interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless, or inexplicable." *Id.* (quotation simplified).

---

provision. *See, e.g.*, *Apple Glen Invs., LP v. Express Scripts, Inc.*, 2018 WL 2945629, at *17 (M.D. Fla. May 25, 2018) (concluding that "the broad language of 'all amounts, costs, expenses, liabilities and obligations' covers attorney[] fees and falls under 'Additional Rent.'").

¶39    In reliance on these principles, JM claims that Paragraph 7 wouldn't have governed PWE's attorney fees request in this instance, but that PWE's request should instead have been based on Paragraph 23, which governed "Remedies and Damages Upon Default." JM points to Paragraph 23(a), which stated that "[i]f an Event of Default shall have occurred and is continuing," PWE would "have the right . . . to exercise its remedies and to collect damages from" JM. Of note, Paragraph 22(a) then included within the definition of "Events of Default," "a failure by [JM] to make any payment of any Monetary Obligation, regardless of the reason for such failure," as well as "a failure by [JM] duly to perform and observe, or a violation or breach of, any other provision hereof." As JM points out, these are the very claims that PWE asserted in its counterclaims and upon which the attorney fees award was ultimately based. From all this, JM thus argues that it's Paragraph 23, not Paragraph 7, that should have controlled any request for attorney fees in this situation, because (1) Paragraph 7 was more specific and (2) interpreting Paragraph 23 in the manner suggested by PWE would render Paragraph 23 superfluous.

¶40    As noted, the district court decided this issue on summary judgment. We've recognized, however, that a contract provision is "ambiguous" when it "is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Pearce v. Purple Innovation, Inc.*, 2025 UT App 45, ¶ 23, 568 P.3d 649 (quotation simplified), *cert. denied*, 574 P.3d 524 (Utah 2025). And we've also recognized that if "the language at issue is ambiguous," "the intent of the parties becomes a question of fact upon which parol evidence of the parties' intentions should be admitted." *Id.* ¶ 24 (quotation simplified); *see also E & H Land, Ltd. v. Farmington City*, 2014 UT App 237, ¶ 21, 336 P.3d 1077 (reversing the district court's grant of summary judgment after finding that the pertinent contract language "seem[ed] to support two or more plausible meanings"

(quotation simplified)). "Therefore, in considering a motion for summary judgment, failure to resolve an ambiguity by determining the parties' intent from parol evidence is error." *WebBank v. American Gen. Annuity Service Corp.*, 2002 UT 88, ¶ 22, 54 P.3d 1139 (quotation simplified).

¶41 Here, on the state of the current briefing, we think the Lease can plausibly be read different ways as to whether PWE was entitled to attorney fees in this circumstance under Paragraph 7(a), or whether the attorney fees request was instead governed by Paragraph 23 (and only Paragraph 23). Because the court's ruling was solely grounded in Paragraph 7(a), and because JM has put forward a reasonable interpretation as to why Paragraph 7(a) was inapplicable, we reverse the district court's conclusion that PWE was entitled to summary judgment on this issue, and we remand for determination of this question in light of additional evidence about the parties' intent.

## CONCLUSION

¶42 For the reasons set forth above, we affirm the district court's decision to award PWE damages for unpaid rent, but we remand for the court to adjust the damages award to account for the 180-day suspension period. We reverse the district court's decision to award PWE attorney fees, and we remand for further proceedings on that issue.

———————