[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-11631

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 17, 2012
JOHN LEY
CLERK

D. C. Docket No. 1:07-cv-00745-JOF

IMPORTERS SERVICE CORPORATION,

Plaintiff - Counter Defendant - Appellant,

versus

GP CHEMICALS EQUITY LLC,

Defendant - Counter Claimant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(May 17, 2012)

Before WILSON, ANDERSON, and HIGGINBOTHAM,* Circuit Judges.

PER CURIAM:

Importers Service Corporation ("ISC") appeals the district court's grant of

_____

*Honorable Patrick E. Higginbotham, United States Circuit Judge for the Fifth Circuit, sitting by
designation.

summary judgment to GP Chemicals Equity LLC ("GP"). ISC and GP started working together in 2000 to develop and market an additive that would serve as a densifying agent in citrus beverages. The product, known as NovaRes, would be developed and produced by GP, then marketed by ISC, which had much more experience in the beverage industry.

For a beverage additive to be used without having to undergo formal Food and Drug Administration ("FDA") approval, it must be generally recognized as safe, or "GRAS." To receive GRAS status for NovaRes, ISC would need to submit an application to the Flavor and Extract Manufacturer's Association ("FEMA" or "FMA"), which has a panel of experts to determine whether new additives are GRAS. The additive can legally be sold as soon as FEMA grants approval. On a somewhat regular basis, FEMA publishes the list of recently approved additives in Food Technology, a popular trade journal. If FEMA rejects an additive, it must go through formal FDA approval.

ISC submitted its initial application for NovaRes to FEMA in July 2002, along with a supplemental application in January 2003. At its February 2003 meeting, FEMA voted to recognize NovaRes as GRAS, and FEMA informed the

parties of this on March 17, 2003.[1]  NovaRes was not published in Food

Technology until August 2005.

On March 10, 2003, the parties signed a contract that required ISC to sell

150,000 pounds of NovaRes per quarter for the first four quarters, then 250,000

pounds per quarter for all subsequent quarters.  However, to give the companies

time to develop NovaRes and get it approved, these sales requirements did not kick

in until after a commercialization period.  As defined in paragraph 1, the "effective

date" when the sales requirements would commence would be

> the earlier to occur of (1) the date ISC has sold One Hundred Fifty
> Thousand (150,000) pounds or more of [NovaRes] to Qualified
> Purchasers in any twelve (12) month period; or (2) the date which is
> 24 months from the date [NovaRes] receives GRAS certification
> and/or Food and Drug Administration approval for use in the Market.

Under paragraph 14, GP was permitted to terminate the contract "if ISC fails

to meet the quantity thresholds for purchases."  At paragraph 16, the contract also

has a "sole remedy" provision stating that GP's

> repurchase of ISC's inventory of [NovaRes] or ISC's right to sell such
> inventory if not so repurchased by [GP] shall constitute ISC's sole
> remedy for the termination or nonrenewal of this Agreement and shall
> be in lieu of all other claims that ISC may have against [GP] as a result
> thereof.  Under no circumstances shall [GP] be liable to ISC by reason

---

[1]      FEMA reissued the letter with minor corrections and additions on April 23, 2003;
on an unknown date in February 2005; and again on March 9, 2005.  However, neither party
contends that those dates are when NovaRes received GRAS certification.

of termination or nonrenewal of this Agreement for compensation, reimbursement, or damages.

However, ISC contends that GP failed to provide sufficient quantities of NovaRes to meet customer orders. Some shipments that did arrive had unacceptable odors and black specks. Despite these problems during the period between September 2003 and March 2006, ISC was able to sell a total of 128,650 pounds of NovaRes. On November 18, 2005, GP terminated the contract and repurchased all of ISC's inventory of NovaRes.

ISC instituted this suit in April 2007, arguing breach of contract, fraud, unjust enrichment, trademark infringement, violations of Georgia's Fair Business Practices Act, and quantum meruit. The only issues raised on appeal are whether the district court properly granted summary judgment to GP on the question of when NovaRes received "GRAS certification" and whether GP's conduct rendered ISC's performance impossible.

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On appeal, we review a district court's grant of summary judgment de novo, and we resolve all reasonable doubts about the facts in favor of the non-movant. Browning v. Peyton, 918 F.2d 1516, 1520 (11th Cir. 1990).

## I. "GRAS" DATE

It is undisputed that ISC never sold 150,000 pounds of NovaRes during any quarter. First, we explore the meaning of the contractual provision that the effective date of the contract would be twenty-four months after NovaRes received "GRAS certification and/or Food and Drug Administration approval for use in the market."

ISC argues that the effective date was not until August 2007, which is twenty-four months after NovaRes was published in Food Technology. Only at that point would the sales requirements kick in. ISC says that GP breached by prematurely terminating the contract on November 18, 2005.

GP insists the effective date was in late February 2005, which is twenty-four months after NovaRes received GRAS certification from the FEMA panel. After that date, GP could terminate the contract if ISC did not sell 150,000 pounds of NovaRes in any quarter. That would mean that the earliest GP could terminate would have been around June 2005, which is six months before GP actually did terminate the contract.

For support, both parties cite to the deposition of John Hallagan, legal advisor to FEMA. While parts of Hallagan's testimony help GP, other parts help

ISC. Hallagan testified that NovaRes "remained FEMA GRAS from February '03 and remains FEMA GRAS today." He reiterated that NovaRes "was determined to be GRAS" in February 2003 and said that the additive could legally be sold in the United States once the FEMA panel approved it in February 2003.

On the other hand, Hallagan stated that the primary reason additives are published in Food Technology is because the "legal requirements for GRAS status include general recognition, and there's case law which goes back many years which shows that you can't have general recognition if nobody knows about the material." He reiterated this remark several times. He also said that "[i]f a party were to make a judgment that something is GRAS, but then there's no publication or notification of it, no description of its condition of intended use, my opinion would be that the material is not, in fact, GRAS, because there's no general recognition."

However, viewing the record most favorably to ISC, we do not find enough evidence to support the claim that there is a genuine dispute over what the parties themselves meant when they used the phrase "GRAS certification."[2] Because no

---

[2] Hallagan testified that FEMA does not use the phrase "GRAS certified" or "GRAS certification," but rather uses the term "GRAS determination." The district court found that the parties' use of "GRAS certification" meant "GRAS determination," and neither party has appealed that decision. Therefore, for consistency, we will use the term "GRAS certification" with the understanding that it is the equivalent of "GRAS determination."

reasonable jury could conclude other than that the parties' use of the term "GRAS certification" was intended to refer to the time at which NovaRes was approved by FEMA, we affirm the district court's determination that GP was entitled to summary judgment on this issue.

Neither party disputes that the contract is construed under Georgia law.

In Georgia, the construction of a contract involves three steps. At least initially, construction is a matter of law for the court. First, the trial court must decide whether the contract language is clear and unambiguous. If it is, the trial court simply enforces the contract according to its clear terms; the contract alone is looked to for meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

McKinley v. Coliseum Health Group, LLC, 708 S.E.2d 682, 684 (Ga. Ct. App. 2011). Here, there is ambiguity as to whether "GRAS certification" meant "FEMA approval" or "publication in Food Technology." In Georgia, "[u]nder the rules of contract construction, parol evidence is admissible to explain an ambiguity in a written contract, although such evidence is inadmissible to add to, take from, or vary the writing itself." Id. (quotation omitted).

When it comes to ambiguous terms, the parties' "interpretation is entitled to great, if not controlling, influence, and will generally be adopted and followed by

the courts, particularly when the parties' interpretation is made before any controversy, or when the construction of one party is against his interest." Eickhoff v. Eickhoff, 435 S.E.2d 914, 920 (Ga. 1993), overruled on other grounds, Lee v. Green Land Co., 527 S.E.2d 204, 205 (Ga. 2000).

The most significant evidence showing the parties' interpretation of "GRAS certification" is contained in two pre-litigation communications: a letter sent by Michael R. Roberts, Business Manager at GP, and an email sent by Robert Vilim, Director of Sales at ISC. These communications indicate that both parties believed that "GRAS certification" would occur when NovaRes received approval from FEMA. This certification would mark the beginning of the twenty-four month commercialization period.

On January 18, 2002, Roberts sent a letter to Eric Berliner, President of ISC, summarizing a meeting between GP and ISC representatives. The letter stated that the "commercialization period will begin the day we have received approval, (from either FMA or the FDA), that our product is acceptable for use in the beverage industry" (emphasis added).[3] Roberts testified that he was in charge of negotiating the contract for GP. This letter provides strong evidence that GP viewed the

---

[3] Berliner testified that he was in agreement with Roberts' summary as contained in the email.

commercialization period as beginning once NovaRes received approval from FEMA–rather than when it was published in Food Technology. The sales quotas would kick in twenty-four months afterward.

As the time period for signing a formal agreement drew nearer, Vilim sent an email on September 16, 2002, to four ISC employees, including Berliner. The email contained an attachment listing Vilim's "thoughts" on the proposed GP contract. The attachment stated among other things, "'Effective Date' – like to see wording closer to our agreement, i.e., after FEMA, we begin clock: when we sell 150000 LB in 12 month period, the 5 year clock begins" (emphasis added). Berliner–who ultimately signed the contract for ISC–testified that Vilim's thoughts matched his own. This email shows that ISC was under the impression that the commercialization period would begin when FEMA gave its approval–rather than when NovaRes was published in Food Technology.

As Hallagan's deposition showed, there is certainly conflicting evidence as to how other parties might view the term "GRAS certification," but its meaning in this contract will be heavily influenced by how it was understood by ISC and GP themselves. Scruggs v. Purvis, 126 S.E.2d 208, 209 (Ga. 1962) ("The construction placed upon a contract by the parties thereto, as shown by their acts and conduct, is entitled to much weight and may be conclusive upon them."). As shown by these

communications, both parties believed that "GRAS certification" meant GRAS approval from FEMA.

However, these two communications are not the only evidence supporting our conclusion that the parties viewed FEMA approval as crucial because it marked the starting point of when ISC could begin selling and marketing NovaRes. The contested contractual term indicated that the commercialization period would begin when NovaRes received "approval for use in the Market." Hallagan testified that it was legal to sell NovaRes as soon as it was approved by FEMA. Berliner believed that even large buyers such as Coca-Cola and Pepsi would purchase NovaRes as soon as it received FEMA approval.

When ISC submitted its application to FEMA, Vilim emailed Tim Adams, Scientific Director of FEMA, and asked, "[A]ssuming fema [sic] grants gras [sic] approval of the NovaRes, do we have any exclusive time to market this gras [sic] status before the status is public knowledge?" Emails between Vilim and GP employees Caryn King and Marty Utterback in late February 2003 indicated that NovaRes had just received "GRAS status," which was "great news" and would be added to the label on sample bags.

In mid-2003, ISC mailed out fliers to the beverage industry, advertising NovaRes as "GRAS approved" with "Samples Now Available." Even as late as

10

April 26, 2004, ISC was still referring to NovaRes as having received "GRAS approval."

Since all of these communications occurred before NovaRes was ever published in Food Technology, they show that the parties believed that NovaRes had received GRAS certification when it was approved by FEMA. There are undoubtedly some advantages to having NovaRes published in Food Technology,[4] but with pre-litigation communication from the parties themselves showing that they intended the sales quotas to begin twenty-four months after FEMA approved NovaRes as GRAS, there is no need to consider how other people may have interpreted "GRAS certification."

Considering all this evidence in ISC's favor, no reasonable jury could conclude other than that the parties' use of the term "GRAS certification" was intended to refer to the time at which NovaRes was approved by FEMA. GP terminated in accordance with the contract, and therefore the district court properly awarded summary judgment on this issue.

---

[4] According to Joan Coletta, Director of East Coast Sales for ISC, there was at least one client who steadfastly refused to buy NovaRes until it was published in Food Technology. Hallagan testified that the list of additives is sent to the FDA before publication, to give the agency a chance to object to any of them. However, no additive has ever been approved by FEMA but then rejected by the FDA.

## II. IMPOSSIBILITY OF PERFORMANCE

ISC also argues that GP failed to provide NovaRes in sufficient quantities, which rendered full performance of the contract impossible. ISC points primarily to conduct by GP that occurred in 2003 during the commercialization period.

However, there is an absence of evidence to show that GP's actions in 2003 rendered the contract impossible to perform in February 2005, when the sales thresholds took effect. ISC also fails to point to any meaningful actions by GP in 2004 or 2005 that would have rendered it impossible to perform the contract. Without this showing, ISC's evidence with respect to GP's actions falls short of creating an issue of fact.

Under Georgia law, impossibility of performance occurs when "the other party . . . repudiates the obligation by act or word, or takes a position which renders performance of the obligation useless or impossible." Taliafaro, Inc. v. Rose, 469 S.E.2d 246, 247-48 (Ga. Ct. App. 1996).

We reject ISC's argument that there is a jury question as to whether GP's conduct during the commercialization period ultimately rendered the contract impossible to perform. We conclude that ISC's impossibility argument cannot succeed in light of our review of the record. For example, our review of the actual invoices shows that, between March 2003 and December 2003, ISC sent about

12

seventy samples to customers, more than in 2004 and 2005 combined, notwithstanding the fact that it was in 2003 (not 2004 or 2005) that there was an alleged shortage of product.[5] Also, even on appeal, ISC has failed to point to evidence that customers would need over a year to test NovaRes and decide whether to buy substantial quantities. ISC has also failed to present any particular customer whose request for a sample in 2003 was unable to be fulfilled due to GP's conduct.[6] Thus, GP's actions in 2003 were insufficient to render the contract "useless or impossible" to perform over a year later in 2005 when the sales thresholds took effect. As for the period after 2003, ISC has not pointed to any conduct by GP substantial enough to make performance impossible.

Accordingly, we affirm the district court's rejection of ISC's impossibility-of-performance argument.[7]

AFFIRMED.

---

[5] This includes almost fifty samples sent from March to September 2003, the same time period for which ISC's Eric Berliner claimed that he was unable to send any more than five samples.

[6] Vilim indicated that he could not name any particular companies. Our review of the record reveals evidence of at most one specific company whose request went unfilled. An email sent by Vilim on July 22, 2003, said that ISC had been unable to fill three particular companies' requests for samples, but invoice records demonstrate that samples were soon sent to two of those companies.

[7] Other arguments asserted by ISC on appeal are rejected for the reasons articulated in the district court's opinion and order dated August 24, 2009.