**2014 UT App 237**

## THE UTAH COURT OF APPEALS

E&H LAND, LTD.,
Plaintiff and Appellant,
*v.*
FARMINGTON CITY,
Defendant and Appellee.

Opinion
No. 20130288-CA
Filed October 2, 2014

Second District Court, Farmington Department
The Honorable Glen R. Dawson
No. 120700541

Stanford P. Fitts and Casey W. Jones, Attorneys
for Appellant

Jody K. Burnett and George A. Hunt, Attorneys
for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN and JOHN A. PEARCE concurred.

ROTH, Judge:

¶1 This case involves a contract dispute between E&H Land, Ltd. (E&H) and Farmington City. Farmington purchased a narrow strip of land that crossed E&H's property in 2011 as part of a development plan connecting two streets in Davis County — Clark Lane and Park Lane. E&H argues that the parties' real estate purchase agreement (the REPC) requires Farmington to use the land to build a roadway and an intersection. Farmington argues that the agreement allows the city to build the intersection wherever it thinks best. The district court granted

Farmington's motion for summary judgment, concluding that the REPC was unambiguous and that there was no language obligating Farmington to construct an intersection in any particular location. We conclude that the REPC is ambiguous on that question, and we remand to the district court to consider extrinsic evidence of the parties' intent.

BACKGROUND[1]

¶2 Farmington contacted E&H in May 2010 to discuss Farmington's plans to extend Park Lane west across E&H's land to connect it to Clark Lane. After some preliminary negotiations, E&H sent Farmington a proposal in July 2010 requesting "[m]ultiple guaranteed access points [to the new road] with no more than 220[ feet] of separation from road intersections." The Mayor replied by letter in September, informing E&H that Farmington "cannot guarantee the number or location of potential property access points without knowing how the property will develop."

¶3 According to E&H, city officials then met with E&H's representatives in October 2010 and agreed, in a face-to-face meeting, that the new intersection "would be centered along E&H's [e]astern property line." This location would essentially leave both E&H and an adjacent property owner with two halves of two different intersection corners, making these areas difficult to develop. Dave Millheim, Farmington's city manager at the time, sent an email in December 2010 encouraging E&H and the neighboring property owner to "work out . . . property transfers" so that each owner would "get control of the

---

1. When reviewing a decision to grant summary judgment, we must "review the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party," and we recite the facts accordingly. *Hale v. Beckstead*, 2005 UT 24, ¶ 2, 116 P.3d 263 (citation and internal quotation marks omitted).

respective corners" of the intersection after the road was complete.[2]

¶4    One month later, E&H entered into the REPC with Farmington to sell the city about 1.5 acres. Exhibits A and B to the REPC contain a legal description of the conveyed parcel and a plat map of the property. The exhibits show a narrow strip of land extending northeast from Clark Lane across the southeast corner of E&H's land that abruptly flares outward to form a shape resembling half of an intersection on E&H's eastern boundary. The parties' dispute in this case hinges on the interpretation of paragraph 6 of the REPC, which provides,

> 6.    Property Improvements. It is specifically understood by the Parties that [Farmington] is purchasing the Property with the intent that it will be used for a realignment of the future Park Lane extension. Any current or future owners of parcels abutting the Property shall be required to install any public improvements necessary to serve those parcels and [E&H] shall have no obligation to such subsequent purchaser other than those obligations customarily imposed under ordinance or common law.

The agreement also contains an integration clause, providing that the REPC, and "any exhibits incorporated by reference, constitutes the final expression of the parties' agreement and is a complete and exclusive statement of the terms of that agreement" that "supersedes all prior or contemporaneous negotiations, discussions and understandings, whether oral or written or otherwise."

---

2. As we discuss later, it is not necessary to examine extrinsic evidence to determine whether the parties' contract is facially ambiguous. *See infra* ¶¶11–13. We have described the parties' preliminary negotiations only to provide context to frame their arguments on appeal.

¶5    One year later, before any construction had occurred, Farmington began considering a proposal to "shift the location of the intersection . . . further to [the] north," entirely off E&H's property. E&H claimed that shifting the location of the intersection would decrease the value of its property by $500,000. Farmington eventually decided to move the intersection, citing an engineering report that recommended the move for safety reasons. E&H sued Farmington for fraud, negligent misrepresentation, breach of contract, breach of the covenant of good faith and fair dealing, and promissory estoppel. Its complaint also requested reformation of the REPC based on a mutual mistake. Farmington moved for summary judgment on all claims, arguing that no language in the contract required it to build the intersection in a particular location and that the integration clause prohibited the court from considering "prior or contemporaneous discussions, negotiations, or understandings" to the contrary. The district court granted Farmington's motion and denied E&H's rule 56(f) motion for additional discovery. E&H now appeals.

ISSUES AND STANDARDS OF REVIEW

¶6    E&H argues that the district court incorrectly granted summary judgment to Farmington on E&H's claims for breach of contract, reformation due to mutual mistake, promissory estoppel, and breach of the covenant of good faith and fair dealing.[3] Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file,

---

3. E&H also appeals the district court's denial of its rule 56(f) motion. However, because we conclude that summary judgment was inappropriate, we need not address the merits of the rule 56(f) motion. *See* Utah R. Civ. P. 56(f) (providing that a court may deny a motion for summary judgment "[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition" and "order a continuance to permit affidavits to be obtained").

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). We review a district court's decision to grant summary judgment for correctness. *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600.

¶7      The merits of several of E&H's claims hinge on the district court's interpretation of the REPC. "The interpretation of a contract is a question of law, which we review for correctness, giving no deference to the ruling of the [district] court." *McNeil Eng'g & Land Surveying, LLC v. Bennett*, 2011 UT App 423, ¶ 7, 268 P.3d 854 (citation and internal quotation marks omitted). "Likewise, the determination of whether a contract is facially ambiguous is a question of law, which we review for correctness." *Id.*

ANALYSIS

¶8      The parties' central dispute in this case boils down to the meaning of the words in paragraph 6 of the REPC: "It is specifically understood by the Parties that [Farmington] is purchasing the Property with the intent that it will be used for a realignment of the future Park Lane extension." E&H argues that the parties used those words to refer to a roadway and an intersection that Farmington had agreed to build across E&H's land to connect Clark Lane and Park Lane. Farmington denies that the parties ever reached an agreement about the location of the intersection and argues that the language of the contract does not reasonably support any other conclusion. Paragraph 6, with our emphasis, provides,

> 6.      Property Improvements. It is specifically understood by the Parties that [Farmington] is purchasing the Property *with the intent that it will be used for a realignment of the future Park Lane extension*. Any current or future owners of parcels abutting the Property shall be required to install any public improvements necessary to serve

those parcels and [E&H] shall have no obligation to such subsequent purchaser other than those obligations customarily imposed under ordinance or common law.

¶9    The REPC does not define "Park Lane extension," but exhibit A to the contract—which contains a legal description of the conveyed parcel—is entitled, "Park Lane Extension Over E and H Property." And E&H points out that two drawings of the parcel in exhibit B depict a "narrow strip" of land that cuts "across E&H's property" before flaring into a "lead-off" portion on the other end of its land that is shaped like half of an intersection. E&H argues that the drawings and legal description "illustrate that Farmington purchased the exact land necessary" to build a roadway and intersection connecting Clark Lane and Park Lane on E&H's land, so paragraph 6 "obligates Farmington to use the [p]urchased [p]roperty for" both "the [r]oadway and [i]ntersection." In the alternative, E&H argues that the parties' prior written communications demonstrate that "the REPC is at a minimum, ambiguous" about the location of the intersection. E&H urges us to consider extrinsic evidence to determine if there is a facial ambiguity even though the REPC has an integration clause. *See Ward v. Intermountain Farms Ass'n*, 907 P.2d 264, 268 (Utah 1995) ("When determining whether a contract is ambiguous, any relevant evidence must be considered.").

¶10    Farmington maintains that "[n]o statement, paragraph or sentence" in the REPC "contain[s] any mention of the proposed location of the intersection between Park Lane and Clark Lane." Consequently, Farmington argues that there is unambiguously no "agreement respecting the location of the intersection . . . that [Farmington] somehow breached." Further, Farmington points out that the REPC has an integration clause, which provides that the REPC is "the final expression of the parties' agreement and is a complete and exclusive statement of the terms of that agreement." In light of that clause, Farmington maintains, it is inappropriate to consider any extrinsic evidence that would create an obligation about which the REPC is conspicuously

silent. We conclude that extrinsic evidence is not necessary to determine that the REPC is facially ambiguous with respect to whether the parties agreed to the location of the intersection. As a consequence, we also conclude that the district court inappropriately granted Farmington summary judgment on the breach of contract, breach of covenant of good faith and fair dealing, and mutual mistake claims.

## I. Ambiguity in the Contract

¶11    E&H argues that the district court "erred by not considering the relevant extrinsic evidence that E&H presented which clearly demonstrated that the REPC was, at a minimum, ambiguous." E&H urges us to consider a variety of emails between the parties that it argues demonstrate that "E&H sold its land to Farmington based upon the understanding that Farmington would use it to build" a roadway and an intersection. In support, E&H cites a line of cases indicating that courts should consider extrinsic evidence of the parties' intent to determine if otherwise unambiguous terms are susceptible to "at least two plausible meanings." *See, e.g., Ward*, 907 P.2d at 268 ("When determining whether a contract is ambiguous, any relevant evidence must be considered."); *McNeil Eng'g & Land Surveying, LLC*, 2011 UT App 423, ¶ 14 ("In determining whether the term 'employment' is ambiguous, we consider relevant extrinsic evidence.").

¶12    E&H is correct that "[u]nder Utah law, if the initial review of the plain language of the contract, within its four corners, reveals no patently obvious ambiguities, the inquiry into whether an ambiguity exists does not end there." *See State v. Davis*, 2011 UT App 74, ¶ 4, 272 P.3d 745 (citation and internal quotation marks omitted). Courts may examine extrinsic evidence that uncovers "a latent ambiguity" that is not apparent from "the face of the instrument." *Watkins v. Henry Day Ford*, 2013 UT 31, ¶ 28, 304 P.3d 841 (citations and internal quotation marks omitted). Here, however, it is not necessary to consider extrinsic evidence because we determine that the language in the REPC is facially ambiguous.

¶13    Unlike latent ambiguities, facial ambiguities are apparent from the face of a document. *Id.* ¶ 27. A facial ambiguity may exist because the contract is "unclear, it omits terms, or the terms used to express the intention of the parties may be understood to have two or more plausible meanings." *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 15, 133 P.3d 428 (citation and internal quotation marks omitted). "In interpreting a contract, [w]e look to the writing itself to ascertain the parties' intentions, and we consider each contract provision . . . in relation to all of the others, with a view toward giving effect to all and ignoring none." *WebBank v. American Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 18, 54 P.3d 1139 (alteration and omission in original) (citation and internal quotation marks omitted). If the contractual terms are "unambiguous, the parties' intentions are determined from the plain meaning" of the words the parties used to describe their agreement. *Id.* ¶ 19. But if a "judge determines that the contract is facially ambiguous, parol evidence of the parties' intentions should be admitted." *Daines v. Vincent*, 2008 UT 51, ¶ 25, 190 P.3d 1269 (citation and internal quotation marks omitted).

¶14    The dispute in this case involves two potential layers of ambiguity. First, does the REPC impose an obligation on Farmington to use the conveyed property for the Park Lane extension? And second, if it does, does paragraph 6 of the REPC bind Farmington to a particular configuration of the project that places the intersection on the land it purchased from E&H? We consider each question in turn and conclude that the REPC is facially ambiguous as to both.

¶15    As we have already noted, paragraph 6 of the REPC provides, "It is specifically understood by the Parties that [Farmington] is purchasing the Property with the intent that it will be used for a realignment of the future Park Lane extension." The word "understood" has two possible meanings in this context that have different legal consequences. First, "understood" can mean that a matter is "fully apprehended"—a recognition or acknowledgment of some future possibility that falls short of an actual agreement. *See Webster's Third New Intern'l*

*Dictionary* 2490 (1993). But the word can also signify that a matter is "agreed upon," *id.*, especially "[a]n agreement . . . of an implied or tacit nature," *Black's Law Dictionary* 1665 (9th ed. 2009) (defining "understanding").[4] Parties often place "understandings" of the first kind in the recitals section of a contract to indicate "the purposes and motives of the parties" even though recitals "do not ordinarily form any part of the real agreement." *See* 17A Am. Jur. 2d *Contracts* § 383 (2004). Instead, the purpose of such clauses is to exert "a material influence in construing the contract and determining the intent of the parties." *Id.* Here, paragraph 6 appears in the body of the REPC in the midst of other paragraphs that set forth contractual obligations, which suggests that the first sentence of paragraph 6 is meant to describe obligations rather than simply a description of the context in which the contract has been made.

¶16    But the wording of the REPC also supports at least one plausible alternative interpretation. Paragraph 6 does not state that the parties executed the REPC with a specific understanding that Farmington would use the conveyed property for the Park Lane extension. Rather, it states that Farmington purchased E&H's land "with the intent" to do so. "Intent" means "[t]he state of mind accompanying an act" or "the mental resolution or determination to do it." *Black's Law Dictionary* 881 (9th ed. 2009). Stated another way, parties that "intend" to do something "desire that a consequence will follow" from their actions. Bryan A. Garner, *Garner's Dictionary of Legal Usage* 468 (3d ed. 2011). Use of the word "intent" may therefore reflect the parties' recognition of a particular plan that Farmington had in mind

---

4. Garner's Dictionary of Legal Usage observes that "understanding is a vague word sometimes used in drafting as a weaker word than *agreement* or *contract*." Bryan A. Garner, *Garner's Dictionary of Legal Usage* 911 (3d ed. 2011). It counsels attorneys to "use the word *agreement*" if the parties intend to make one because "[p]hrases such as *It is the parties' understanding that* or *In accordance with the parties' understanding* are subject to a variety of interpretations—and ought therefore to be avoided." *Id.*

and desired to carry out but to which it was unwilling to commit contractually when the REPC was executed. That is, the first sentence of paragraph 6 discussing the parties' "understanding" that Farmington intended to build a road on the conveyed parcel may simply be recital-like language that provides context for the parties' agreement over the installation of public improvements. Paragraph 6 provides that E&H "shall have no obligation" to "install any public improvements necessary to serve" parcels "abutting the Property." That burden, according to paragraph 6, falls on "current or future owners of parcels abutting the Property."

¶17   Consequently, despite the placement of paragraph 6 in the body of the REPC, instead of its recitals section, the parties' use of the words "understanding" and "intent" make the legal effect of that paragraph unclear. It might mean that the parties specifically understood that Farmington purchased E&H's land with a plan to use it for the Park Lane extension and agreed to implement that plan. It is also possible, however, that the parties simply hoped that Farmington's plan to use the land for the project would come to fruition but understood that Farmington was not in a position to commit contractually, so they included this language in paragraph 6 as a non-binding expression of the context in which the purchase of E&H's property had arisen—in other words as no more than a recital. Thus, because "the terms used to express the intention of the parties may be understood to have two or more plausible meanings," they are facially ambiguous. *See Saleh*, 2006 UT 20, ¶ 15 (citation and internal quotation marks omitted).

¶18   Having concluded that one plausible reading of the contract requires Farmington to use E&H's land for the "realignment of the future Park Lane extension," we must now consider whether those terms can reasonably be read to encompass a particular configuration of the project that requires placement of an intersection on the eastern boundary of E&H's land. Unfortunately, the REPC does not define the term "realignment of the future Park Lane extension" with any clarity. Exhibit A, which contains a legal description of the conveyed

parcel, is entitled "Park Lane Extension Over E and H Property." And exhibit B is a "Map of Property" that graphically depicts the legal description, showing bare boundaries without an explanation of how those boundaries might relate to any proposed configuration of the project. Together, the exhibits show a narrow strip of land that cuts in a northeasterly direction across E&H's property from Clark Lane before flaring into a wider portion at the eastern border of E&H's property to resemble half of an intersection. As we have discussed, one plausible reading of the contract is that Farmington actually agreed to use this narrow, irregularly shaped parcel "for a realignment of the future Park Lane extension." But beyond whatever the shape of the parcel itself might suggest, the REPC does not discuss any details of the configuration of that project.

¶19    E&H argues that it would never have sold "the narrow strip of land and lead-off that cuts through the middle of its parcel" without an agreement that Farmington would use it "for a roadway and intersection." It also points to other language in paragraph 6 that obligates future owners to "install any public improvements necessary to serve those parcels." Farmington maintains that even if it is obligated to use the land for a roadway, the REPC simply "contain[s] no reference whatsoever to any duty respecting placement or location of the intersection of Clark Lane and Park Lane."

¶20    In light of the language of paragraph 6 and the shape of the parcel depicted in the exhibits, we conclude that the REPC is reasonably susceptible to either interpretation. Farmington is correct that the agreement has no language that describes a configuration of the Park Lane extension that requires Farmington to build an intersection in a particular location. It is therefore possible that although Farmington agreed to "use[]" E&H's land for the project, it had not finalized plans for the intersection and purchased the lead-off portion to preserve one of several potential options for the intersection's location without intending to bind itself to the location depicted. "Park Lane extension" may therefore refer generally to a road connecting Clark Lane and Park Lane without encompassing a

specific configuration for the final project. But the shape of the parcel also plausibly suggests that Farmington was very careful to purchase only the land it needed to complete the Park Lane extension and that its plans included an intersection on the eastern boundary of E&H's land. As we have already noted, the legal description of the parcel is entitled, "Park Lane Extension Over E and H Property," which may indicate that the parties had reached a final agreement about the configuration of the project and the placement of the intersection—reflected in the shape of the conveyed parcel—and agreed that Farmington would "use[]" the property according to that understanding.

¶21 So, assuming that the parties intended to bind Farmington to construct the Park Lane extension across the E&H property, the contract's language and exhibits leave us with a question about the scope of Farmington's obligation that does not seem resolvable within the four corners of the REPC. And because the reach of the term "realignment of the future Park Lane extension" is unclear and the language seems to support "two or more plausible meanings" when read in light of the exhibits to the contract, we conclude that the REPC is ambiguous about whether Farmington may build the intersection on the border of E&H's property or must do so. *See Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 15, 133 P.3d 428 (citation and internal quotation marks omitted). When an ambiguity exists, the intent of the parties becomes "a question of fact" upon which "parol evidence of the parties' intentions should be admitted." *Daines v. Vincent*, 2008 UT 51, ¶ 25, 190 P.3d 1269 (citation and internal quotation marks omitted). We therefore reverse the district court's decision granting summary judgment to Farmington on the breach of contract claim and remand for the court to consider extrinsic evidence of the parties' intent.

## II. Other Claims

¶22    E&H also argues that its claims for breach of the covenant of good faith and fair dealing, promissory estoppel, and reformation due to mutual mistake should survive summary judgment. We agree that the breach of the covenant of good faith and fair dealing and reformation due to mutual mistake claims should survive summary judgment. However, we conclude that the district court properly awarded Farmington summary judgment on the promissory estoppel claim.

### A.    Breach of the Covenant of Good Faith and Fair Dealing

¶23    The district court's dismissal of E&H's covenant of good faith and fair dealing claim hinged on its determination that there was no "language in the REPC" that "required placement of the intersection of Park Lane and Clark Lane at a specific location on the boundary of [E&H's] property." This was consistent with the court's approach to the resolution of E&H's breach of contract claim because the covenant of good faith and fair dealing cannot "establish new, independent rights or duties to which the parties did not agree ex ante." *Oakwood Vill. LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 45, 104 P.3d 1226. But in light of our determination that the REPC is ambiguous about the placement of the intersection, there is a factual issue about whether the contract obligates Farmington to construct an intersection on the border of E&H's property. Consequently, on remand, E&H may be able to demonstrate that Farmington "intentionally destroy[ed] or injure[d] [E&H's] right to receive the fruits of the contract." *See id.* ¶ 43 (citation and internal quotation marks omitted). Summary judgment on this claim was therefore premature.

### B.    Reformation Due to Mutual Mistake

¶24    The district court rejected E&H's reformation due to mutual mistake claim because it concluded that the claim "did not seek to invalidate the REPC but merely to amend it and substitute terms" contrary to the Utah Supreme Court's decision

in *Tangren Family Trust v. Tangren*, 2008 UT 20, 182 P.3d 326. In *Tangren*, our supreme court observed that "extrinsic evidence is appropriately considered, even in the face of a clear integration clause, where the contract is alleged to be a forgery, a joke, a sham, lacking in consideration, or where a contract is voidable for fraud, duress, mistake, or illegality." *Id.* ¶ 15. To its memorandum opposing summary judgment, E&H attached numerous affidavits and emails that it argued demonstrated that the parties had agreed on the placement of the intersection. Farmington submitted an affidavit from a city official purporting to show the contrary. Based on the *Tangren* decision, the district court refused to consider any extrinsic evidence of the parties' intent and awarded Farmington summary judgment on the reformation claim. We conclude that the district court should have considered extrinsic evidence of the parties' intent.

¶25    The district court misread *Tangren*. It is true that *Tangren* recognized that "mistake" is one of several grounds upon which courts may consider "extrinsic evidence in support of an argument that the contract is not . . . valid" despite a clear integration clause, *id.*, and it is also true that E&H has alleged mutual mistake to reform the REPC rather than attack its validity. But the issue in *Tangren* was whether parol evidence was admissible to demonstrate whether or not a contract was integrated, not whether a mutual mistake warranted reformation of the parties' agreement. *Id.* ¶¶ 8–9. And Utah law is clear that "[a] mutual mistake of fact can provide the basis for equitable rescission *or reformation* of a contract even when the contract appears on its face to be a complete and binding integrated agreement." *Burningham v. Westgate Resorts, Ltd.*, 2013 UT App 244, ¶ 12, 317 P.3d 445 (emphasis added) (citation and internal quotation marks omitted). "A mutual mistake occurs when both parties, at the time of contracting, share a misconception about a basic assumption or vital fact upon which they based their bargain," *id.* (citation and internal quotation marks omitted), and subsequently fail to reduce their actual intent to writing, *FDIC v. Taylor*, 2011 UT App 416, ¶ 47, 267 P.3d 949. *See also Peterson v. Coca-Cola USA*, 2002 UT 42, ¶ 19, 48 P.3d 941 (noting that mutual mistake "warrants the reformation" of a contract where, among

other things, "the instrument as made failed to conform to what the parties intended" (citation and internal quotation marks omitted)). Consequently, the district court erred when it determined that the REPC's integration clause precluded any consideration of extrinsic evidence to resolve E&H's reformation due to mutual mistake claim and when it granted summary judgment without considering the various affidavits and emails the parties submitted.

¶26 Farmington nevertheless maintains that the reformation claim fails because the common law doctrine of merger and the REPC's abrogation clause "eliminate[] the contract and merg[e] it into the" deed, so there is "no contract to reform." The REPC does indeed have an abrogation clause, which provides, "Except for those paragraphs in this Agreement expressly surviving the Closing, and the express warranties contained in this Agreement, execution and delivery of the final closing documents shall abrogate this Agreement." And Farmington is also correct that in real estate transactions, the merger doctrine generally requires that on "delivery and acceptance of a deed[,] the provisions of the underlying contract for the conveyance are deemed extinguished or superseded by the deed." *Secor v. Knight*, 716 P.2d 790, 792 (Utah 1986).

¶27 The merger doctrine, however, applies "when the acts to be performed by the seller in a contract relate only to the delivery of title to the buyer." *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 2009 UT 65, ¶ 65, 221 P.3d 234 (citation and internal quotation marks omitted). Obligations that are "collateral" to delivery and acceptance of the deed "are not extinguished by [conveyance]." *Id.* ¶ 66. And because an abrogation clause is a "contractual statement of the common law doctrine of merger," Utah courts have routinely applied this "collateral rights" exception in the face of contracts containing abrogation clauses.[5] *Maynard v.*

---

5. Mutual mistake, contractual ambiguity, and fraud are also exceptions to the merger doctrine. *Maynard v. Wharton*, 912 P.2d 446, 450 (Utah Ct. App. 1996).

*Wharton*, 912 P.2d 446, 450 (Utah Ct. App. 1996); *see also Secor*, 716 P.2d at 792; *Embassy Group, Inc. v. Hatch*, 865 P.2d 1366, 1371–72 (Utah Ct. App. 1993). To determine if an obligation is collateral, Utah courts examine (1) "whether the act involve[s] a different subject matter or is collateral to the conveyance [of title]" and (2) "whether the parties intended the act to be collateral." *Davencourt*, 2009 UT 65, ¶ 66 (alterations in original) (citation, emphasis, and internal quotation marks omitted). The second factor is only relevant "if the question of the collateral nature remains" after analyzing the first factor. *Id.* (citation and internal quotation marks omitted).

¶28    Here, if the district court determines that the REPC obligates Farmington to construct a roadway and intersection, the subject matter of that obligation is qualitatively different than simple delivery and acceptance of the deed. In *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 2009 UT 65, 221 P.3d 234, the Utah Supreme Court concluded that "warranties regarding the quality of construction" were collateral to the conveyance of title. *Id.* ¶ 69. If the obligation to assure that a structure meets some minimum level of quality survives the deed, we see no reason why an obligation to develop a parcel of land should be treated any differently. And the fact that Farmington intended to build the Park Lane extension sometime after purchasing E&H's land provides further support for that conclusion. *See id.* ¶ 73 (noting that "[a]n act performed after the delivery of the deed can, by itself, show the parties intended the contract terms to be collateral"). We therefore conclude that neither the merger doctrine nor the abrogation clause bar E&H's reformation due to mutual mistake claim.

C.    Promissory Estoppel

¶29    E&H argues that the district court erred when it granted Farmington summary judgment on the promissory estoppel claim. "Promissory estoppel is an equitable claim for relief" that compensates a party who has detrimentally relied on another's promise. *Andreason v. Aetna Cas. & Sur. Co.*, 848 P.2d 171, 174–75

(Utah Ct. App. 1993). The promise must be sufficiently clear and definite that the person making the promise should reasonably expect the other party to rely on it. *Id.* Like unjust enrichment and other equitable remedies, promissory estoppel is available only to a party who has no right to relief under an enforceable contract. *Mile High Indus. v. Cohen*, 222 F.3d 845, 859 (10th Cir. 2000) (noting that "'promissory estoppel' is an affirmative cause of action or defense, which arises in instances where no formal contract exists and the party seeking promissory estoppel is attempting to prove the existence of an enforceable promise or agreement"); *see also R.J. Daum Constr. Co. v. Child*, 247 P.2d 817, 823 (Utah 1952) ("There is a recognized doctrine of promissory estoppel usually involving offers to make a gift, where although accepted, no binding contract results because there is no consideration.").

¶30   Of course, a plaintiff who believes it is entitled to relief under a contract is free to assert both breach of contract and promissory estoppel claims in a complaint. "Our rules of civil procedure do not limit the number of claims or defenses a party may plead," nor is there any requirement that claims be consistent with one another. *Northgate Vill. Dev., LC v. Orem City*, 2014 UT App 86, ¶ 48, 325 P.3d 123 (citing Utah R. Civ. P. 8(e)). "But at later stages of the proceeding, consistency requirements limit the freedom the parties enjoyed at the pleading stage." *Id.* For example, this court recently observed that "though the parties 'may raise alternative theories on breach of contract and quantum meruit at the pleading stage, once the court has determined that a valid contract governed the parties' relationship, that generally precludes a quantum meruit claim.'" *Id.* ¶ 49 (quoting *Importers Serv. Corp. v. GP Chems. Equity, LLC*, 652 F. Supp. 2d 1292, 1303 (N.D. Ga. 2009), *aff'd*, 476 F. App'x 717 (11th Cir. 2012)).

¶31   Here, neither party has argued that the REPC is invalid or inapplicable to their dispute. And the district court determined at summary judgment that the REPC was valid and enforceable. Once a court determines "that an enforceable contract exists and governs the subject matter of the dispute," the plaintiff is no

longer free to maintain inconsistent legal claims for breach of contract and equitable claims for promissory estoppel or unjust enrichment. *Id.* We therefore conclude that the district court properly granted Farmington summary judgment on E&H's promissory estoppel claim.

CONCLUSION

¶32    We affirm the district court's dismissal of the promissory estoppel claim. However, we conclude that the REPC is ambiguous regarding the parties' understanding as to the location of the intersection and therefore reverse the district court's decision granting Farmington summary judgment on the breach of contract and breach of the covenant of good faith and fair dealing claims. We also reverse the district court's decision granting summary judgment on the reformation due to mutual mistake claim. On remand, the district court should consider relevant extrinsic evidence of the parties' intent both to resolve an ambiguity in the REPC and to determine if reformation is warranted due to a mutual mistake.

_____